IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


JENNIFER MARTIN-HARRIS                                    PLAINTIFF


        v.                    CIVIL NO. 2:18-CV-2103


ANDREW M. SAUL,[1] Commissioner,
Social Security Administration                            DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Jennifer Martin-Harris, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed applications for DIB and SSI on November 16, 2015, alleging an inability to work since August 3, 2012,[2] due to degenerative disc disease, generalized anxiety disorder, depression, chronic panic disorder, agoraphobia, Asperger's

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] Plaintiff amended her original onset date of December 1, 2013, to August 3, 2012.  (Tx. 259, 265).

Syndrome, Posttraumatic Stress Disorder, and battered wife syndrome.[3]  (Tr. 88, 105, 124, 143).  For DIB purposes, Plaintiff maintained insured status through September 30, 2018.  (Tr. 87, 104, 123, 142).  An administrative hearing was held on May 3, 2017.  (Tr. 42-84).  Plaintiff was present and testified.  (Tr. 55-75).    Julie A. Harvey, Vocational Expert (VE), was also present and testified.  (Tr. 75-84).

In a written opinion dated September 8, 2017, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, cervical degenerative disc disease, cervical spondylosis without myelopathy, lumbar spondylosis without myelopathy, chronic pain syndrome, depression, opioid dependence, generalized anxiety disorder with panic attacks and agoraphobia, and post-traumatic stress disorder.  (Tr. 13).  However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 13-16). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416. 967(b), except for the following:

> [C]laimant can perform frequent overhead reaching bilaterally; the claimant can perform unlimited reaching (except overhead) in all other directions bilaterally; the claimant can perform "simple" tasks; "simple" tasks are unskilled entry-level tasks with a SVP of one, which can be learned by simple demonstration, and a SVP of two, which can be learned in thirty days or less; the claimant can relate to others, including supervisors and co-workers (except the general public) on a "superficial" work basis; "superficial" means brief, succinct, cursory, concise communication relevant to the tasks being performed; the claimant cannot relate to the general public; and can adapt to a work situation. The claimant has no other physical or mental limitations or restrictions.

---

[3] Due to Plaintiff's prior applications that were denied on March 18, 2014, the earliest onset date would be March 19, 2014.

(Tr. 16-23).  With the help of a VE, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as a merchandise marker, housekeeping cleaner, and routing clerk. (Tr. 24).  Ultimately, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from August 3, 2012, through the date of the ALJ's opinion.  (Tr. 24).

Subsequently, Plaintiff requested a review of the hearing decision by the Appeals Council, which denied that request on April 10, 2018.  (Tr. 1-6).  Plaintiff filed a Petition for Judicial Review of the matter on June 12, 2018.  (Doc. 1).  Both parties have submitted briefs, and this case is before the undersigned for report and recommendation.  (Docs. 15, 16).

The Court has reviewed the transcript in its entirety.  The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Submitted:

At the hearing before the ALJ on May 3, 2017, Plaintiff testified that she was born in 1966 and received a college degree.  (Tr. 55). Testimony showed that after Plaintiff's alleged onset of disability, she worked for the Arkansas Department of Human Services and for Arkansas Therapy Outreach.  (Tr. 69-74).

Prior to the relevant time period, medical records showed that Plaintiff was treated for chronic neck pain and pain in her lumbar spine region, right shoulder, right arm, pelvic region, and right hip.  She was also seen for a conversion reaction that was psychiatric in nature and was referred for a psychiatric evaluation. She was treated for anxiety, chest pain, right arm numbness, panic disorder, hot flashes, cervical radiculitis, cervicalgia, and headaches.

Medical evidence during the relevant time period reflects that on April 29, 2014, Plaintiff presented at Baptist Family Clinic for a follow up visit with Dr. Jerry Cavaneau for her anxiety, which was poorly controlled. (Tr. 805). Plaintiff's physical examination was normal. (Tr. 806). Her anxiety medication was adjusted. (Tr. 807).

On May 16, 2014, Plaintiff saw Dr. Butchaiah Garlapati at Arkansas Pain Center for a follow up examination for her neck and right shoulder pain. (Tr. 509). Plaintiff stated that her medications were working well and that she had not experienced any side effects. Her pain level remained at a seven out of ten. (Tr. 509). Plaintiff's physical examination showed tenderness and restricted range of motion in areas of her spine. (Tr. 510). Her neurologic and psych examinations were normal. Plaintiff was diagnosed with cervicalgia, cervical radiculitis, and headache. Plaintiff was instructed to continue with her current medication regimen of fentanyl and oxycodone-acetaminophen. (Tr. 511).

On May 29, 2014, Plaintiff went to Baptist Family Clinic for a follow up visit. Plaintiff's anxiety-related symptoms were well controlled; however, she still reported difficulty in functioning. Her hyperlipidemia was stable. (Tr. 801). Dr. Cavaneau instructed Plaintiff to continue her medications. (Tr. 803).

On July 14, 2014, Plaintiff was seen at Arkansas Pain Center, Ltd. by Rebecca Foster, Physician Assistant, and supervising physician, Dr. Butchaiah Garlapati for a follow up examination for her neck pain and right shoulder pain. (Tr. 505). Plaintiff reported that her medications were working well. (Tr. 505). Examination notes indicated that Plaintiff had a non-antalgic gait and did not use any assistive devices; she was able to sit comfortably on the examination table without difficulty or evidence of pain; and she showed signs of tenderness

4

and restricted range of motion in areas of her spine. (Tr. 506). She was diagnosed with cervicalgia, cervical radiculitis, and headache. Her medications were refilled as she was stable and had seen improvement of function and activities of daily living on her current regimen. (Tr. 507).

On July 15, 2014, Plaintiff was seen at the Baptist Family Clinic. She reported that her headaches were mild and improving; her hot flashes were improving; her hyperlipidemia was stable; and her anxiety symptoms were well controlled. (Tr. 784). Plaintiff was assessed with hyperlipidemia, headaches, hot flashes, and anxiety. Dr. Cavaneau continued her medication. (Tr. 786).

On August 1, 2014, Plaintiff visited Dr. Cavaneau at Baptist Family Clinic for a follow up of her anxiety and hyperlipidemia. Clinic notes indicated that Plaintiff's related symptoms were well controlled, and her hyperlipidemia was stable. (Tr. 797). Plaintiff's medications were refilled. (Tr. 799).

On September 8, 2014, Plaintiff was seen at Baptist Family Clinic by Dr. Cavaneau, where she reported some associated symptoms of hyperlipidemia, some symptoms of anxiety, and some mild memory loss. (Tr. 792). Plaintiff was instructed to continue her medication for her anxiety, and a MRI of the brain/head was ordered. (Tr. 794).

On September 12, 2014, Plaintiff was seen at Arkansas Pain Center by Rebecca Foster (PA) for a follow up examination of her right neck and shoulder pain. (Tr. 500). With the exception of some constipation, Plaintiff was doing well on her medications. (Tr. 500). Plaintiff was able to sit comfortably on the examination table without difficulty or evidence of pain; had a non-antalgic gait; and did not use any assistive devices. (Tr. 501). Her physical

5

examination showed tenderness and restricted range of motion in areas of her spine. (Tr. 501-502). Her neurologic and psychiatric examinations were normal. For her diagnoses of cervicalgia, cervical radiculitis, and headaches, Plaintiff's current medications were refilled. Clinic notes indicated that function and activities of daily living improved optimally on current doses of medications. (Tr. 503).

A MRI of Plaintiff's brain also performed on September 12, 2014, showed unremarkable pre- and post-contrast MRI of the brain for age, and no findings explained the patient's headaches. (Tr. 950).

On September 15, 2014, Plaintiff was seen by Dr. Cavaneau for a follow up appointment. (Tr. 788). Plaintiff stated that her hot flashes were improving; that she was adhering to her medication for her hyperlipidemia; and that her headaches were improving. (Tr. 788). She was assessed with hyperlipidemia, headaches, and hot flashes. (Tr. 790).

On November 11, 2014, Plaintiff was seen at Arkansas Pain Center by Rebecca Foster (PA), and Dr. Garlapati for a follow up examination. (Tr.496). Plaintiff reported that she was doing well on her medication. (Tr. 496). Plaintiff's physical examination showed that she was doing well except that she appeared to be in mild pain and tearful. Plaintiff had a non-antalgic gait and did not use any assistive devices. (Tr. 497). She had tenderness and limited range of motion in areas of her spine; her neurological examination was normal; and her psych examination was normal. She was diagnosed with cervicalgia, cervical radiculitis, and headache. (Tr. 498). Her medications were refilled. (Tr. 498).

On December 19, 2014, Plaintiff presented at Baptist Family Clinic. Plaintiff reported that her anxiety had improved, her hot flashes had improved, and her hyperlipidemia was stable. (Tr. 780). Her medications were continued. (Tr. 782).

On January 9, 2015, Plaintiff returned to Arkansas Pain Center for a follow up examination. (Tr.492). Plaintiff described her quality of sleep as good; stated that her medications were working well; and that her activity level remained the same. (Tr. 492). Clinic notes stated that Plaintiff was in no distress, was alert and oriented, and was able to sit comfortably on the table without difficulty or evidence of pain. Plaintiff had a non-antalgic gait and did not use any assistive devices. (Tr. 493). Plaintiff's physical examination showed tenderness and restricted range of motion in some areas of the spine; her neurologic examination was normal; and her psych examination was normal. Plaintiff's diagnoses were cervicalgia, cervical radiculitis, and headache. (Tr. 494). Plaintiff's medications were refilled. (Tr. 495).

On March 10, 2015, Plaintiff was seen at Arkansas Pain Center by Rebecca Foster (PA) and Dr. Garlapati for her a follow up examination for her low back pain, headache, right shoulder pain, and right leg pain. (Tr. 487). Plaintiff stated that her medications were working well; that she had no side effects to report; and that her quality of sleep was fair. (Tr. 487). Clinic notes stated that Plaintiff was in no distress, was alert and oriented, and was able to sit comfortably on the table without difficulty or evidence of pain. Plaintiff had a non-antalgic gait and did not use any assistive devices. (Tr. 488). Plaintiff showed no signs of depression or anxiety. (Tr. 489). A physical examination of her spine showed tenderness and restricted range of motion in some areas, and Plaintiff's diagnoses were cervicalgia, cervical radiculitis,

7

and headache. (Tr. 489). Plaintiff's medications were continued at the current dosage. (Tr. 489).

On March 13, 2015, Plaintiff saw Dr. Cavaneau for a follow up visit. Plaintiff complained of difficulty functioning, anxiousness and fearful thoughts. (Tr. 775). She was assessed with hyperlipidemia, a ganglion cyst, hot flashes, and anxiety. (Tr. 777).

On May 8, 2015, Plaintiff Rebecca Foster (PA) and Dr. Garlapati for low back pain, headache, right shoulder pain and right leg pain. (Tr. 483). Plaintiff was complaining that her pain had worsened since her last visit; however, Plaintiff also reported that her medication was working well. (Tr. 483). Clinic notes indicated that Plaintiff appeared to be fatigued, but that she was well groomed, well nourished, and had a non-antalgic gait. (Tr. 484). Plaintiff's physical examination showed tenderness and restricted range of motion in some areas of her spine; a normal neurologic examination; and a normal psych examination. Her diagnosis was cervicalgia, cervical radiculitis, and headache. (Tr. 485). Plaintiff's fentanyl patch and oxycodone-acetaminophen were refilled that day. She was instructed to continue her current medications based on her report of adequate pain relief and increased function as a result of the medication. (Tr. 485).

On July 7, 2015, Plaintiff returned to Rebecca Foster (PA) and Dr. Garlapati for low back pain, headache, right shoulder pain and right leg pain. (Tr. 479). Plaintiff reported that her pain patches were only lasting 48 hours, and the increase in dosage did not help the duration. (Tr. 479). Notes showed that Plaintiff had a non-antalgic gait and did not use assistive devices. (Tr. 480). A physical examination of Plaintiff's spine showed tenderness in some areas and limited range of motion in some areas, and she was diagnosed with cervicalgia,

cervical radiculitis, and headache. (Tr. 481). Plaintiff's medications were continued at the current dosage. (Tr. 482).

On September 4, 2015, Plaintiff visited Arkansas Pain Centers with complaints of low back pain, headache, right shoulder pain, and right leg pain. (Tr. 474). Plaintiff reported that her quality of sleep was "good;" her medications were working well; she had no side effects; and that her activity level had remained the same. (Tr. 474). Clinic notes indicated that Plaintiff had a non-antalgic gait and did not use any assistive devices. (Tr. 475). Her psych examination was normal. After a physical examination, Plaintiff was assessed with cervicalgia, cervical radiculitis, and headache. (Tr. 476). Dr. Muhammad Arshad's notes indicated that he informed Plaintiff that she was being discharged from care that day because her last two urine drug screens were not compliant with the prescribed medication. Plaintiff verbalized her understanding of this and left the clinic. (Tr. 477).

On September 8, 2015, Plaintiff was seen at Baptist Family Clinic by Dr. Cavaneau for a follow up on her anxiety, back pain, hyperlipidemia and hot flashes. (Tr. 771). She was assessed with degenerative disc disease of the thoracic spine, degeneration of the cervical intervertebral disc, hyperlipidemia, hot flashes, and anxiety. (Tr. 773).

On September 23, 2015, Plaintiff was seen in the Saline County Emergency Room for bilateral hand pain and minor lacerations after breaking into her own house. (Tr. 730). Her history of depression was noted. (Tr. 731). Hospital records indicated that Plaintiff's lacerations were very superficial and that penetrating glass injury was unlikely. (Tr. 734). Plaintiff was instructed to follow up with her primary care physician as needed. (Tr. 734).

On October 7, 2015, Plaintiff returned to the Baptist Health Family Clinic, where she saw Dr. Cavaneau for her follow up of anxiety and back pain. Plaintiff reported that she was not having difficulty functioning, but that she was anxious, had fearful thoughts, had a depressed mood and was fatigued.  Clinic notes indicated that her anxiety was aggravated by family issues.  Clinic notes also indicted that her upper back pain and neck pain were relieved by medication. (Tr. 767). Plaintiff was assessed with degenerative disc disease of the cervical and thoracic spine and anxiety.  (Tr. 769).

On November 1, 2015, Plaintiff visited the Counseling Clinic with suicidal ideation. (Tr. 561).  Plaintiff reported stress with her ongoing divorce.  (Tr. 561). She was diagnosed with adjustment disorder with anxiety, panic disorder, agoraphobia, specific phobia (natural environment), and relationship distress with spouse or partner.   (Tr. 562). Plaintiff was admitted to Saline Memorial Behavioral Health that day. (Tr. 564).  She was diagnosed with adjustment disorder with anxiety, depression, and suicidal ideations. (Tr. 663).

On November 5, 2015, Plaintiff was discharged to outpatient treatment, as her condition had improved, she had no signs of suicidal thoughts, and she did not show any evidence of psychosis.  (Tr. 649).

On November 6, 2015, Plaintiff was seen at Baptist Family Clinic for a follow up on anxiety and back pain. (Tr. 763). Plaintiff was assessed with degenerative disc disease and anxiety, and her medications were continued. (Tr. 765).

On November 10, 2015, Plaintiff denied any suicidal thoughts and was discharged from Saline Memorial Behavioral Health.  (Tr. 565).

Also, on November 10, 2015, Plaintiff was seen by Dr. Ahmad Ghaleb at Advanced Spine and Pain Centers for her history of back and neck pain. (Tr. 848). She described her pain as burning in nature, radicular, and impacting her daily activities. (Tr. 848). Plaintiff was assessed with lumbago, cervical spondylosis without myelopathy, lumbosacral spondylosis without myelopathy, and chronic pain associated with significant psychosocial dysfunction. Plaintiff was fitted for a back brace for her low spine. A nerve block was recommended for her cervical spine. (Tr. 850). Her pain medication was also refilled. (Tr. 851).

On November 12, 2015, Plaintiff was transported to the Saline Memorial Emergency Room for chest pain. (Tr. 572). After an examination, she was discharged home with instructions to return to the emergency room if her symptoms worsened. (Tr. 580). Acute Coronary Syndrome had been ruled and her secondary diagnosis was anxiety. (Tr. 923). Her medications were adjusted. (Tr. 924).

On November 23, 2015, Plaintiff underwent a medial branch nerve block at C3-4, C4-5, and C5-6. (Tr. 983).

On December 4, 2015, Plaintiff saw Dr. Cavaneau for follow up on her back pain, anxiety, and her recent hospital visit. (Tr. 759). She was assessed with degenerative disc disease, hot flashes, anxiety and depression. (Tr. 762).

On December 7, 2015, Plaintiff was seen at Advanced Spine Center and received a medial branch block at C3-4, C4-5, and C5-6. (Tr. 988).

On January 11, 2016, Plaintiff received another median branch block at C3-4, C4-5 and C5-6. (Tr. 989).

11

On March 4, 2016, Plaintiff was admitted to Integris Mental Health Center after visiting the emergency room with complaints of chest pain. (Tr. 991). She was also tearful, having anxious thoughts, and thoughts of harming herself. (Tr. 991). Plaintiff was able to participate in group and individual therapeutic services during hospitalization and was able to continue treatment with outpatient services. She was diagnosed with major depressive disorder and unspecified anxiety disorder. She was discharged on March 9. (Tr. 991).

On March 15, 2016, Plaintiff saw Dr. Matthew Hagg for medication refills. (Tr. 1018). Clinic notes indicate one refill only and that she should see someone in pain management. Her diagnoses included: chronic cervical degenerative disc disease, opioid dependence, depression, and anxiety. (Tr. 1018).

On March 30, 2016, Plaintiff saw Dr. Hagg for a medication refill. Plaintiff's chart indicates that she filled her medication at Don's Pharmacy without any recollection of doing so. She was diagnosed with chronic cervical degenerative disc disease, opioid dependence, and short-term memory loss. Dr. Hagg noted that Plaintiff would not receive any more refills. (Tr. 1017).

On April 4, 2016, Plaintiff saw Dr. Julie Wallace, Ph.D. for a mental consultative examination. (Tr. 1010). Generally, Plaintiff was cooperative, had good hygiene, and was in obvious pain in her neck, shoulders, arms, back, and right leg. (Tr. 1010). Plaintiff was wearing a back brace and her gait was very slow. (Tr. 1010). Plaintiff reported that her physical and mental issues were as a result of her husband's physical abuse. Plaintiff stated that she suffered from anxiety, interrupted sleep, and decreased motivation. She said she had trouble concentrating, had trouble with anxiety symptoms, and that she had been hospitalized twice

12

for suicidal ideation. (Tr. 1010). Plaintiff was experiencing panic attacks, agoraphobia, nightmares, and PTSD symptoms. She was unable to work due to her inability to focus, panic attacks and other perceptual abnormalities. (Tr. 1011). Plaintiff explained that he had been hospitalized on two occasions for suicidal ideations but was not currently in counseling. (Tr. 1011). Plaintiff reported that she had difficulty performing activities of daily living autonomously and consistently; that she had panic attacks in the shower; and that she cooked very little. She said that she avoided social functioning because of her panic attacks and agoraphobia, and that she was unable to go anywhere. (Tr. 1011). Plaintiff told Dr. Wallace that she had a bachelor's degree in social work with a minor in psychology and graduated with honors. She also stated that he had moved in with her brother and sister-in-law in Oklahoma and was fearful that her ex-husband would try to find her. (Tr. 1012). Dr. Wallace noted that Plaintiff's speech was normal in rate, volume, fluency, and effectiveness; her thought processes appeared to be relevant; and her thought content was all normal. Plaintiff's perceptual abnormalities included seeing things out of the corner of her eye and hearing music and voices. Her affect was appropriate and content consistent. (Tr. 1012). Plaintiff was alert and fully oriented to the day, month, year, place and city, but she did not know the date. She was not able to repeat five digits forward on the first attempt but was able to do so when given a second number. She was able to repeat three digits backward. (Tr. 1012). Her recall, memory and concentration were all fine during the interview; however, she reported difficulty concentrating at times. (Tr. 1013). She was estimated to be functioning in the average to above average range of intellectual capabilities; however, her judgment and insight were limited or distorted at times by her mental health issues, panic attacks, PTSD, agoraphobia, and depression. Her diagnoses were major depressive disorder, generalized anxiety disorder with panic attacks and

13

agoraphobia, and posttraumatic stress disorder.  Dr. Wallace noted that Plaintiff had the cognitive and verbal abilities to participate in counseling and to benefit from treatment.  She recommended that Plaintiff continue her medication review and management.  She also noted that Plaintiff was able to manage funds without assistance.  (Tr. 1013).

On April 13, 2016, Burnard Pearce, Ph.D., a non-examining medical consultant, completed a Psychiatric Review Technique, and determined that Plaintiff had an established mental impairment and that her mental health problems moderately limited her global functioning.  (Tr. 95, 112).  Dr. Pearce also completed a Mental RFC Assessment where he found that Plaintiff could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation.  (Tr. 100, 116-117).  That day, Dr. Evette Budrich, a non-examining medical consultant, completed a Physical RFC assessment where she determined that Plaintiff was capable of light work with limited overhead reaching to frequently with both the right and left arms.  (Tr. 97-98, 114-115).

On May 25, 2016, Plaintiff returned to Dr. Hagg for medication refill.  (Tr. 1016).  Clinic notes indicated Plaintiff was wearing her back brace.  She was diagnosed with cervical degenerative disc disease and opioid dependence, and she was referred to pain management.  (Tr. 1016).

On June 28, 2016, Plaintiff saw Dr. Hagg for an additional medication refill on her fentanyl and oxycodone.  (Tr. 1015).  Plaintiff reported that her medication was not working well.  Clinic notes indicated that Plaintiff had not seen the pain management doctor yet.  Plaintiff complained of muscle pain and back ache.  She was diagnosed with cervical degenerative disc disease, opioid dependence, and depression.  (Tr. 1015).

14

On July 28, 2016, Plaintiff saw Dr. Hagg for medication refills and a referral. (Tr. 1052). She was diagnosed with cervical degenerative disc disease and opioid dependence. Plaintiff's fentanyl and oxycodone were refilled, and a referral was made to pain management. (Tr. 1052).

On August 5, 2016, Carolyn Goodrich, Ph.D., a non-examining medical consultant, completed a Psychiatric Review Technique, and noted that at reconsideration there were no new or worsening mental allegations. (Tr. 132). She determined that Plaintiff did not appear to need any outpatient treatment but had mild to moderate limitations in global functioning. (Tr. 133, 152).

On August 11, 2016, Dr. Donald Baldwin, a non-examining medical consultant, completed a Physical RFC Assessment and affirmed the previous assessment of light work with limited overhead reaching to frequently with both the right and left arms. (Tr. 135, 156).

On August 15, 2016, Dr. Carolyn Goodrich, Ph.D., a non-examining medical consultant, completed a Mental RFC Assessment and affirmed the previous determination that Plaintiff could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation. (Tr. 139, 158).

On August 21, 2016, Plaintiff was seen at Deaconess Hospital Emergency Room for sharp, stabbing, right-sided pain radiating to the right side of her neck and arm. (Tr. 1025). Plaintiff alleged that her brother was threatening to move her to a psychiatric facility and that she did not want to go. (Tr. 1040). Plaintiff's chest imaging was clear, showing no acute cardiopulmonary process and no evidence of pulmonary embolism; she denied suicidal

thoughts; and her condition improved.  (Tr. 1027, 1034).  She was discharged the same day and a follow-up appointment was scheduled.  (Tr. 1027).

On August 30, 2016, Plaintiff returned to Dr. Hagg for medication refills.  The notes indicated that she was having a good month, her pain was stable, and her medications were helping with some residual pain.  (Tr. 1051).  Dr. Hagg indicated that he and Plaintiff discussed that her pain may not be absolutely resolved.  She was diagnosed as having cervical degenerative disc disease and opioid dependence.  (Tr. 1051).

On October 4, 2016, Dr. Hagg saw Plaintiff for medication refills. (Tr. 1050).  Clinic notes indicated that at Plaintiff's appointment with pain management, she was told that her insurance was not accepted by that physician.  She was diagnosed with chronic cervical degenerative disc disease, opioid dependence, depression, and hormone replacement therapy.  Her medications were refilled.  (Tr. 1050).

On November 15, 2016, Plaintiff returned to Dr. Hagg for additional refills on her fentanyl and oxycodone.  Clinic notes indicated that Plaintiff's Lexapro was working well and also that she had not received a call from pain management.  Plaintiff was diagnosed with cervical degenerative disc disease, opioid dependence, and lumbar back pain.  Dr. Hagg noted that Plaintiff needed a consultation for her low back.  (Tr. 1049).

On December 16, 2016, Plaintiff saw Dr. Hagg for refills on her fentanyl and oxycodone.  (Tr. 1048).  Plaintiff's diagnosis was cervical degenerative disc disease and opioid dependence.  Her pain medications appear to have been refilled, and a note on her chart indicated that she was awaiting new insurance coverage.  (Tr. 1048).

16

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff makes the following arguments on appeal: 1) that the ALJ erred in failing to fully and fairly develop the record; 2); that the ALJ properly considered all of Plaintiff's impairments in combination; and 3) that the ALJ did not adequately take into account Plaintiff's global assessment of functioning (GAF) score of 41.  (Doc. 15, pp. 1-6).

### A.    Failure to Fully Develop the Record:

The ALJ has a duty to fully and fairly develop the record.  See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case.  Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record.  "Reversal due to failure to develop the record is only warranted where such failure is unfair and prejudicial." Shannon v. Chater, 54

18

F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

Plaintiff appears to allege that the ALJ erred in failing to seek further clarification from the Plaintiff's health care providers, as well as Dr. Wallace, regarding the nature and severity of her impairments. Further Plaintiff alleges that there was no residual functional capacity evaluation in Dr. Wallace's consultative examination regarding Plaintiff's impairments or her ability to function in the workplace. (Doc. 15, p. 2). Contrary to Plaintiff's assertion, the Court finds that the record before the ALJ contained treating physicians' records, counseling records, clinic notes, emergency room and hospital records, imaging and other diagnostic testing, function reports, hearing testimony, a consultative mental examination, and opinions of non-examining medical consultants, all of which was considered in making a full and informed decision regarding Plaintiff's capabilities during the relevant time period. After review, the undersigned finds the ALJ fully and fairly developed the record.

### B. Plaintiff's Impairments:

The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, cervical degenerative disc disease, cervical spondylosis without myelopathy, lumbar spondylosis without myelopathy, chronic pain syndrome, depression, opioid dependence, generalized anxiety disorder with panic attacks and agoraphobia, and post-traumatic stress disorder. (Tr. 13). The ALJ also found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926). (Tr. 13). The ALJ stated in his decision that "Disability is defined as the inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (Tr. 11). The ALJ further noted in his decision that at step two, "the undersigned must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe' (20 CFR 416.920(c))." (Tr. 11). He also stated that if the claimant did not have a severe medically determinable impairment "or combination of impairments," she is not disabled, but that if the claimant has a severe impairment "or combination of impairments," the analysis proceeds to the third step. (Tr. 12). The ALJ continued to refer to the need to consider the combination of impairments in the remainder of his decision.  As noted by Defendant, the Eighth Circuit Court of Appeals has held that such language demonstrates that the ALJ considered the combined effect of Plaintiff's impairments. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

The Court finds that Plaintiff's argument is without merit, and there was sufficient evidence for the ALJ to make an informed decision. Therefore, the Court finds the ALJ properly considered Plaintiff's impairments both singularly and in combination.

**C.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5)

20

functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ noted Plaintiff's testimony that she was unable to work because she could not stand up straight; she had extreme pain in her neck, middle back, low back, right leg, and right arm; and she was unable to focus; however, Plaintiff also testified that she was not taking any pain medication at the time of the hearing. (Tr. 58). She stated that she kept her leg elevated and remained stationary for her pain relief. (Tr. 58). Plaintiff stated that she could stand only ten to fifteen minutes, could sit only ten to twenty minutes a day, and could walk only a couple of feet. (Tr. 58-59). She could not lift a gallon of milk, and she could not reach overhead. (Tr. 60). Plaintiff stated that she relied on her daughter to help with activities of daily living. Plaintiff stated that she had a fear of showering and had difficulty using her arms to care for her hair. (Tr. 62). Plaintiff testified that she did not have a physician for mental health, but that she relied on her primary care physician. (Tr. 62). Plaintiff stated that her mental health symptoms included crying spells, mood swings, seeing shadows, hearing voices, and hearing music. She had problems with her mind racing; she had trouble making decisions; and she suffered from panic attacks. (Tr. 63-66). Plaintiff stated that she was unable to leave the house, despite medical records indicating that she was going to various doctor

appointments. (Tr. 68). Plaintiff was wearing a back brace that day, but she was not using a cane or walking device. (Tr. 60).

In the February 16, 2016, Function Report, Plaintiff reported that she cared for her two dogs with help from her brother on her bad days; that she could prepare sandwiches and other no-cook meals; that she could do some laundry; that she could go out for doctor appointments and for grocery shopping; that she could drive a car; that she could go out alone sometimes; and that she could shop in stores and on the computer. (Tr. 335-337). Plaintiff reported that while she sometimes had no ability to or interest in engaging in her hobbies, those hobbies included watching television, being on the computer, going to church activities, sewing, dancing, going out to special events, watching her grandchildren, and shopping at the mall. (Tr. 338). Later in the Function Report, she stated that she did not have any social activities and that she only attended doctor appointments. (Tr. 338). Plaintiff reported that she could walk across the room, but would have to rest for several minutes; that she could pay attention for a couple of minutes; that she did not finish what she started; that she could not follow written instructions well; and that she could not remember spoken instructions. (Tr. 339). As for personal care, Plaintiff reported a fear of showering and trouble with caring for her hair. (Tr. 335).

With respect to Plaintiff's physical impairments, the record demonstrates that Plaintiff's back and neck conditions were treated conservatively. See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). Plaintiff's medical record also showed that Plaintiff's chronic pain improved with treatment. Impairments that can be controlled with treatment or medication are not

disabling. See <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

With respect to Plaintiff's mental impairments, the record also demonstrates that Plaintiff was treated conservatively with medication by her primary care physician. (Tr. 62). While Plaintiff also underwent a few days of inpatient mental health treatment on two different occasions during the relevant time period (in November of 2015, and March of 2016), on both occasions, she was treated with medication and therapy and was stable upon release. (Tr. 565, 991). There was no further evidence of ongoing counseling or specific psychiatric treatment for Plaintiff's mental conditions. See <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against Plaintiff's claim of disability).

Although it is clear that Plaintiff suffers some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### D.    ALJ's RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. <u>Id</u>. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005); <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a

"claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In finding Plaintiff able to perform light work with limitations, the ALJ considered Plaintiff's subjective complaints, the medical records, and the evaluations of the examining and non-examining agency medical consultants. Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on her activities that would preclude performing the RFC determined during the relevant time period. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).

Plaintiff alleges that the ALJ failed to adequately account for Plaintiff's GAF score and that with a GAF score of 41, Plaintiff would be limited beyond the scope of the RFC. A GAF score is a numerical assessment between zero and one hundred that reflects a mental health examiner's judgment of an individual's social, occupational, and psychological function. Kluesner v. Astrue, 607 F.3d 533, 535 (8th Cir. 2010); Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) ("The GAF score is a subjective determination that represents 'the clinician's judgment of an individual's overall level of functioning'.") (internal citation omitted). We have long held that, while occasionally helpful, a particular GAF score does not warrant a finding of disability, and a failure to analyze GAF scores alone is not proper grounds to reverse a disability determination. Jones at 973. (citing with approval cases from the United

States Court of Appeals, Sixth Circuit) (internal citation and quotation omitted). The Court is cognizant of cases where the Eighth Circuit has held that GAF scores, especially those at or below 40, must be carefully evaluated when determining a claimant's RFC. See, e.g., Conklin v. Astrue, 360 Fed.Appx. 704, 707 (8th Cir. 2010) (reversing and remanding in part because the ALJ failed to consider a claimant's GAF scores of 35 and 40); Pates-Fires v. Astrue, 564 F.3d 935, 944-45 (8th Cir. 2009) (holding that the ALJ's RFC finding was not supported by substantial evidence in the record as a whole, in part due to the ALJ's failure to discuss or consider numerous GAF scores below 50). We return to the primary charge of this Court, however, and as long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015). As the Eighth Circuit has long held, we must affirm the ALJ's decision if, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ. Id.  Here, after review of the record, the ALJ's RFC determination is supported by substantial evidence in the record as a whole, despite the ALJ's failure to further limit Plaintiff based on her GAF score alone.

The Court notes that with regard to a third-party statement completed by Plaintiff's brother, the ALJ properly considered this evidence but found it unpersuasive. This determination was within the ALJ's province. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

Upon careful review of the record, the Court finds that Plaintiff's arguments are without merit and that substantial evidence supports the ALJ's RFC determination.

25

### E.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005); see also Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014) (concluding that the ALJ properly phrased the hypothetical to the vocational expert, recognizing that a hypothetical need only include impairments that the ALJ finds credible).   Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a merchandise marker, housekeeping cleaner, and routing clerk. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

26

DATED this 9th day of July, 2019.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE